UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
LIRON JAMIL,

                        Plaintiff,

        - against -

JEFF SESSIONS, as Attorney General,

                        Defendant.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
14-CV-2355 (PKC) (RLM)

PAMELA K. CHEN, United States District Judge:

Plaintiff Liron Jamil brings this action against Defendant Jeff Sessions,[1] alleging religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), on the basis that the Bureau of Prisons ("BOP") failed to accommodate his religion (Orthodox Judaism).   Defendant[2] now moves for summary judgment. For the reasons discussed below, the Court DENIES Defendant's Motion for Summary Judgment, finding that a reasonable jury could conclude that Defendant failed to prove that it reasonably accommodated Plaintiff or that it would be unable to do so without incurring undue hardship.

---

[1] Pursuant to Federal Rule of Civil Procedure ("FRCP") 25(d), Jeff Sessions, who was sworn in on February 9, 2017 as Attorney General, has been automatically substituted for Eric Holder as the sole defendant.  The Clerk's Office is respectfully directed to change the caption of the docket to reflect this substitution.

[2] Although Attorney General Sessions is the nominal Defendant in this action, because he is named solely in his capacity as the representative of the BOP, the Court uses the impersonal pronoun "it", rather than "he", when referring to Defendant in this opinion.

## I.    THE FACTS

### A.    The Parties

Plaintiff Liron Jamil ("Plaintiff" or "Jamil") is an Orthodox Jew who refrains from work on the Sabbath as part of his faith. (Dkt. 24 ("Def's Exs."), Ex. B, at 9–10, 19–20). The Sabbath is a 25-hour period starting at sunset on Friday and ending one hour after sunset on Saturday. (Dkt. 24-2 ("Def. 56.1") ¶ 2.)

Metropolitan Detention Center ("MDC") Brooklyn is the largest federal detention center within the Bureau of Prisons ("BOP"). (Def. 56.1 ¶ 9.) MDC Brooklyn receives and discharges inmates 24 hours per day and seven days per week. (Def. 56.1 ¶ 10.) During Plaintiff's employment, MDC Brooklyn housed approximately 2,500 inmates and employed more than 500 staff members, 320 of whom were correctional officers. (Def. 56.1 ¶¶ 11, 20; Def. Ex. K ("Hess Deposition") at 6.) According to Defendant, during a 25-hour period, approximately 176 officers were required to maintain the security of MDC Brooklyn. (Def. 56.1 ¶ 12.)

Frank Strada became the warden of MDC Brooklyn in approximately June 2011. (Def. 56.1 ¶ 13.) As the warden, he was responsible for the overall security and safety of the institution and the correctional officers. (Def. 56.1 ¶¶ 16, 82.)

Douglas Hess was a captain at MDC Brooklyn during Plaintiff's employment at the facility, and was the chief correctional services supervisor. (Def. 56.1 ¶¶ 17–18.) Hess oversaw the staffing of the correctional services roster, "making sure that no post went unassigned and that security was not compromised." (Def. 56.1 ¶ 19.) He oversaw the staffing of approximately

---

[3] The facts in this section are taken from the parties' Rule 56.1 submissions and the record evidence cited therein. Unless otherwise noted, a standalone citation to a Rule 56.1 Statement denotes that the Court has deemed the underlying factual allegation undisputed. Any citations to a party's Rule 56.1 Statement incorporates by reference the documents cited therein, though where relevant, the Court has cited directly to those underlying documents.

320 correctional officers to fill 200 different posts at MDC Brooklyn. (Def. 56.1 ¶ 20.) Staff requests for sick time, days off, and annual leave were handled by the Administrative Lieutenant or the Deputy Captain, who in April 2013 was Richard Wolfe. (Def. 56.1 ¶¶ 24–25.)

During Plaintiff's employment at MDC Brooklyn, Elizabeth Marin-Rodriguez was the Human Resources manager, and was responsible for coordinating staffing, training, benefits, and incentive awards, as well as responding to labor grievances. (Def. 56.1 ¶¶ 27, 29.)

**B.      Plaintiff's Application Process and Initial Employment**

Plaintiff applied to work as a correctional officer with the BOP in 2013. (Def. 56.1 ¶¶ 30–31.) He submitted an online application, his resume, and other documentation, and had two interviews. (Def. 56.1 ¶¶ 31–32.) In the course of the interviewing process, Plaintiff was told that correctional officer shifts varied, that the position included work on holidays and during weekends, and that correctional officers worked rotating schedules. (Def. 56.1 ¶ 33.) Plaintiff was not asked if he would be able to work Friday evenings or Saturdays, and Plaintiff did not inform anyone during the interview process that he would be unable to work during those hours. (Def. 56.1 ¶ 34; Pl. 56.1 Counterstatement ¶ 34.)

The correctional officer job description stated that "[d]uring institution emergencies or other periods of heavy workload or limited staff, correctional officers may be required to work long and irregular hours, unusual shifts, Sundays, holidays, and unexpected overtime." (Def. 56.1 ¶ 35.)

BOP hired Plaintiff as a correctional officer at MDC Brooklyn, and he started work there on or about March 25, 2013. (Def. 56.1 ¶¶ 36, 40.) As a new hire, he was a probationary correctional officer, meaning that he worked on a training roster with a rotating schedule. (Def. 56.1 ¶¶ 41, 44, 92–93) Probation "generally lasts about a year, but can be reduced to six

months." (Def. 56.1 ¶ 46.)  In contrast, non-probationary employees bid on their work schedules based on seniority.  (Def. 56.1 ¶ 43, 91–92.)  Senior officers "[g]enerally" bid to have Friday evenings and Saturdays off.[4]  (Def. 56.1 ¶ 94.)  Probationary officers "generally did not have Saturdays off."  (Def. 56.1 ¶ 96.)

### C.  Plaintiff's Scheduling Conflicts

In March 2013, Plaintiff was scheduled to complete a two-week training period.  (Def. 56.1 ¶¶ 36, 47.)  Three to four days of the training fell on Passover.  (Def. 56.1 ¶¶ 50–51.)  Plaintiff informed Human Resources that he could not attend some of the training dates because they coincided with Passover.  (Def. 56.1 ¶ 55.)  The BOP did not require Plaintiff to attend training on days that coincided with Passover, allowing him to make up the training on different days. (Def. 56.1 ¶ 53.)

Plaintiff received his first work schedule at the end of the training period; that schedule contained his work hours for the following two weeks.  (Def. 56.1 ¶¶ 55–56.)  Plaintiff told someone at Human Resources[5] that he had a conflict with his assigned shift on Saturday, April 13, 2013, because of his Sabbath observance.  (Def. 56.1 ¶ 58–59; Def's Ex. B at 29.)  Plaintiff also spoke with Captain Hess about his conflict, and Captain Hess told him "that's not going to be a problem."  (Def's Ex. B at 29–30.)[6]  Upon being instructed to do so by someone at Human

---

[4] It is important to note that the period between sundown on Friday and an hour after sundown on Saturday covers four potential shift assignments, Friday "night watch," and Saturday "morning watch," "day watch" and "night watch."  (Def's Ex. B at 27–29; Def's Ex. K at 22.)  Plaintiff was able to work two out of the three Friday shifts (morning and day), and all three shifts on Sundays.  (Def's Ex. B at 27–28.)  However, he was not able to work any of the three Saturday shifts.  (*Id.*)  Correctional officers were assigned consecutive days off, but if they swapped a shift, their days off would not necessarily be consecutive.  (Def's Ex. K at 23–24.)

[5] Plaintiff does not remember to whom he spoke at Human Resources.  (Def's Ex. B at 29.)

[6] Hess denies having said this.  (Def. Ex. K, at 37–38.)

Resources, Plaintiff submitted a written request on April 5, 2013 to the Associate Warden and to Captain Hess asking "permission to have any/all work scheduling to be generated outside of the Sabbath time frame." (Def. 56.1 ¶¶ 60–61.) In the meantime, Marin-Rodriguez told Plaintiff that he could try to alleviate his scheduling conflict by swapping shifts with other officers or putting in a request for leave without pay. (Def. 56.1 ¶¶ 62–63.) Strada was the only person with the authority to grant requests for leave without pay, and the ability to obtain such leave was subject to staff availability. (Def. 56.1 ¶¶ 72, 109.)

On April 17, 2013, Plaintiff submitted a letter to Strada, stating that he had not received a response to his April 5, 2013 request to be permanently excused from all Sabbath shifts, and requesting retroactive leave without pay for April 13, 2013, and leave without pay for Friday, April 19, 2013 and Saturday, April 20, 2013. (Def. 56.1 ¶¶ 70–71.) Strada granted Plaintiff's requests for leave without pay for the three specified shifts. (Def. 56.1 ¶¶ 72–73; Def's Ex. B, at 50.)

### D. Defendant's Response to Plaintiff's Request for Permanent Accommodation

Strada and Marin-Rodriguez discussed Plaintiff's request to be permanently excused from Friday evening and Saturday shifts; that discussion included consideration of the proper response to the request pursuant to the Master Agreement between the correctional officers' union ("the Union") and the BOP. (Def. 56.1 ¶ 75; Pl. 56.1 Counterstatement ¶¶ 132, 135.) The Master Agreement was a collective bargaining agreement ("CBA") that covered non-probationary employees, but did not govern probationary employees, such as Plaintiff. (Def. Ex. L, at 17.) Although Strada appears to have told Marin-Rodriguez that he would follow agency protocol, (Def's Ex. L, at 54–55,) Strada himself was unaware of any company policy or protocol concerning religious accommodations, as this was the first or second religious

accommodation request he had received.  (Pl. 56.1 Counterstatement ¶ 134; Def's Ex. H, at 20–21.)  Marin-Rodriguez had encountered only one previous request from a correctional officer for a religious accommodation during her seven years in the Human Resources Department.  (Def's Ex. L, at 6–7, 49.)  There is no evidence that Marin-Rodriguez and Strada discussed the financial impact, scheduling impact, or impact on employee morale that would have resulted from granting Plaintiff's request.  (Pl. 56.1 Counterstatement ¶ 142; Def's Ex. L, at 59–60.)[7]  Both Marin-Rodriguez and Strada acknowledged that they were not involved in the roster assignments, and that Hess and the Lieutenants had that role.  (Def's Ex. H, at 45; Def's Ex. L, at 23–24.)  Hess testified that he had no recollection of Marin-Rodriguez or anyone else from Human Resources asking him for any information about the effect of accommodating Plaintiff's request on staffing, or for any rosters to review.  (Def's Ex. K, at 39–40.)  Hess also testified that he never brought Plaintiff's request to the attention of any of the Union representatives.  (Def's Ex. K, at 36.)

Marin-Rodriguez researched the issue, and sent a draft response memorandum to the BOP's Employment Law Branch in Washington, D.C. for legal review.  (Def. 56.1 ¶ 77; Pl. 56.1 Counterstatement ¶¶ 136, 138.)  The draft memorandum denied Plaintiff's request to be permanently given days off on the Sabbath.  (*Id.*)  Marin-Rodriguez sent the draft memorandum, and may have sent Plaintiff's request letter, to the Employment Law Branch, but she did not send any additional documentation, and the Employment Law Branch never requested any additional information or documents.  (Def's Exhibit L, at 44–47.)  Marin-Rodriguez stated that her draft

---

[7] Defendant purports to dispute this fact, but only by saying that Strada and Marin-Rodriguez "had several discussions about plaintiff's specific request to be excused from all Friday evenings and Saturday morning shifts" without citing any evidence in the record that they discussed the impact or burden of accommodating Plaintiff.  (Dkt. 24-24 (Def's Consolidated 56.1 Statement)  ¶ 142.)

was based on "training received, . . . on the law, [and] . . . on the DOJ Reasonable Accommodation Manual," but that she did not have access to the Accommodation Manual that day, "which is why [the draft] went for Legal Review as well." (*Id.* at 60–61.) Marin-Rodriguez had received yearly training about how to handle religious accommodation requests by employees, although the training was not specific to correctional officers. (*Id.* at 62.) At the time of her deposition in this case, Marin-Rodriguez stated that she "believe[d]" there was a section in the DOJ Reasonable Accommodation Manual about religious accommodation but did not "know it off the top of [her] head." (*Id.* at 61.)

After the Employment Law Branch reviewed the response memorandum, Marin-Rodriguez made "minor" changes, consisting of an additional citation, and gave it to Strada, who reviewed the memorandum, signed it, and gave it to Plaintiff on April 22, 2013. (Def. 56.1 ¶¶ 78–79; Pl. 56.1 Counterstatement ¶ 141.) In the memorandum, Strada denied Plaintiff's request to be permanently excused from Friday night and Saturday shifts, "based on the effects that granting such a request would have on MDC Brooklyn, including (a) the operational and financial effects; (b) the potential infringement on the seniority system outlined in the Master Agreement; and (c) the effect on the morale of other employees." (Def. 56.1 ¶¶ 80–81.)[8]

At Strada's deposition in this case, he stated that a schedule change to accommodate Plaintiff in the way he requested would have "impact[ed] the whole operation of the institution." (Def's Ex. H, at 41–42; Def. 56.1 ¶ 83.) More specifically, according to Strada and Hess, granting the requested schedule change would have: (1) required paying other staff overtime to

---

[8] Plaintiff responds to this, as well as many of Defendant's other facts that are supported solely or mostly by Strada's testimony, by stating that, "[t]here is no documentary evidence anywhere in the record documenting these effects other than Warden Strada's own self-serving and conclusory statements." (Pl. 56.1 Counterstatement ¶ 81.) The Court discusses this lack of supporting evidence in Parts II(B) and (C), *infra*.

cover Plaintiff's shifts, whereas Strada had always sought to minimize overtime because of MDC Brooklyn's "limited" and "strict" budget (Def. 56.1 ¶¶ 85, 88–89);[9] (2) violated the seniority system by allowing Plaintiff to work a schedule that other correctional officers gained only through seniority and the ability to bid for their desired schedules (Def. 56.1 ¶ 97; Def's Ex. K, at 21–22, 23); (3) affected morale among the staff by allowing Plaintiff to work a schedule preferred by more senior officers (Def. 56.1 ¶¶ 98, 100)[10]; (4) required pulling other officers and staff members from previously assigned posts, thus resulting in an increase in those officers and staff members' workloads, and an administrative burden on the institution (Def. 56.1 ¶ 99); and (5) affected the security of the institution (Def's Ex. J, at ¶ 15.)

### E.    Plaintiff's Efforts to Adjust His Schedule to Accommodate His Religious Observance

During the three-month period that Plaintiff worked as a probationary correctional officer, he was assigned to a shift that fell during the Sabbath every week, starting on April 13, 2013.   (Def. 56.1 ¶ 66.)   Wolfe, the supervisory officer in charge of leave requests, trained

---

[9] Strada stated that he instead used overtime pay for "institutional emergenc[ies]" at the prison, such as a riot or an emergency medical trip.  (Def's Ex. H, at 35; Def. 56.1 ¶ 90.)  He also testified that inmates at MDC Brooklyn depended on staff, including correctional officers, for certain services.  (Def. 56.1 ¶¶ 82, 84.)  Defendant's budgetary constraints were corroborated by Associate Warden Eric Bradley and Deputy Captain Richard Wolfe.  (Def's Ex. P (Bradley Deposition), at 6–7) ("We have budgetary concerns, obviously . . . it's not like I can pay overtime for every individual to be off."); (Def's Ex. O (Wolfe Deposition), at 9.)  However, their depositions did not include a discussion of why accommodating Plaintiff would have required paying other employees overtime.

[10] In response to this assertion, Plaintiff points out that there "is no testimony from even a single employee indicating an unwillingness to swap Sabbath hours with the plaintiff."  (Pl. 56.1 Counterstatement ¶ 98.)  He similarly points to "no documentary evidence . . . [regarding] the alleged change in morale" or showing that "defendant was unable to persuade even one co-employee to swap Sabbath hours with [Plaintiff]."  (*Id.* at ¶ 100.)  Defendant, however, points to Plaintiff's own testimony to the effect that some Lieutenants and officers made him feel like "Oh, you're the guy that's having a problem" and "You're the one that wants to be a senior on the fast track and take the weekends off."  (Def's Ex. D., page 29.)

Plaintiff on how to use the facility's computerized mutual exchange board to post requests for shift swaps with other officers. (Def. 56.1 ¶¶ 105, 111.) Plaintiff successfully engaged in several mutual swaps for Friday shifts that fell during the Sabbath, but he was unable to find an officer willing to work his assigned Saturday shifts. (Def. 56.1 ¶¶ 67–68.)

When Plaintiff was unable to find an officer willing to do a swift swap with him, he submitted a request for leave without pay for his first Saturday shift, on April 13, 2013. (Def. 56.1 ¶¶ 64–66, 69.) Strada granted Plaintiff's requests for leave without pay when there was sufficient staff to relieve him, which amounted to approximately six or seven times during the three-month period, but denied Plaintiff's requests when there was insufficient staff or insufficient funds to cover overtime, which occurred on approximately nine occasions. (Def. 56.1 ¶¶ 116–20, 123.)[11]

On those occasions when Plaintiff's requests for leave without pay were denied and he could not find someone with whom to swap shifts, he did not report to work. (Def. 56.1 ¶¶ 119, 123.) On those occasions, he was marked absent without leave ("AWOL"). (Def. 56.1 ¶ 120.) Plaintiff was not paid for days that he received leave without pay or for days that he was marked AWOL. (Def. 56.1 ¶ 121.) Generally, when a BOP employee has repeated charges of AWOL, the agency conducts an investigation, during which the employee has the opportunity to give an oral or written explanation of the charges, and then the agency determines if any disciplinary action is warranted. (Def's Ex. I, at ¶ 8.) Disciplinary action ranges from a letter of reprimand to suspension. (*Id.*) Plaintiff was neither investigated nor sanctioned for his AWOL designations. (Def. 56.1 ¶ 124.)

---

[11] Plaintiff argues that "[b]ased on the scant record, it's just as likely that defendant's granting of some of plaintiff's requests for leave without pay was simpl[y] arbitrary." (Pl. 56.1 Counterstatement ¶¶ 116, 118.)

On some occasions when Plaintiff did not report to work and was marked AWOL, Strada paid overtime to other MDC staff members to cover Plaintiff's assigned post. (Def. 56.1 ¶ 128.)[12] MDC Brooklyn paid 56 hours of overtime to cover Plaintiff's shifts, which Strada had to deduct from other parts of the MDC budget. (Def. 56.1 ¶¶ 129–30.)[13] On those occasions, staff had to be pulled from other assignments to fill Plaintiff's vacant post. (Def. 56.1 ¶ 131.)

On June 5, 2013, Plaintiff resigned from his position. (Def. 56.1 ¶ 4.) He testified that he was "financially . . . burdened by not being able to work" the days that he was being designated as AWOL, and that the "stress factors" of trying to get accommodations so that he could observe the Sabbath essentially "forced [him] into resigning." (Def's Ex. B, at 65–67.) He stated that he was not "making the income [he] needed to," "wasn't able to pay [his] bills on time" and had been required to start withdrawing money from his savings and from his wife's savings. (*Id.* at 67.) Plaintiff also was unable to supplement his income with other work, because his work shift was on rotation rather than a set schedule. (*Id.*) Strada confirmed that, to his knowledge, Plaintiff resigned "because of financial issues . . . because he couldn't – obviously, he couldn't work on Fridays and Saturdays, he was taking the leave without pay and not getting paid[, and] was incurring financial hardship." (Def's Ex. H, at 50.)

## II.    PROCEDURAL HISTORY

Plaintiff filed this suit on April 11, 2014, alleging that Defendant had discriminated against him on the basis of his religion in violation of Title VII by failing to accommodate his reasonable request for a religious accommodation. (Dkt. 1.) Defendant's Motion for Summary Judgment was fully briefed on April 22, 2016. (Dkt. 25.)

---

[12] Defendant did not introduce any documentary evidence of overtime payments.

[13] Defendant submitted no documentary evidence of its budget.

**DISCUSSION**

## I.      STANDARD OF REVIEW

A defendant seeking summary judgment must establish that "there is no genuine dispute as to any material fact," and that they are thus "entitled to judgment as a matter of law." FRCP 56(a). "Material" facts are facts that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Genuine" disputes exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once a defendant has met this initial burden, the plaintiff must "designate specific facts showing that there *is* a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (emphasis added; quotations omitted).

The Second Circuit has "explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment [in employment discrimination cases] because the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." *Thompson v. Kaufman's Bakery, Inc.*, 03-CV-340S, 2005 WL 643433, at *3 (W.D.N.Y. March 16, 2005); *see also Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) (stating that "[a] trial court must be cautious about granting summary judgment to an employer when, as [in a discrimination case], its intent is at issue"). Nevertheless, the "summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also Marmulszteyn v. Napolitano*, 08-CV-4094, 2012 WL 3645776, at *5 (E.D.N.Y. Aug. 22, 2012) ("Although the

Second Circuit has stated that district courts should be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question, summary judgment in such a case may still be warranted if the plaintiff relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." (internal quotations and alterations omitted) (quoting *Figueroa v. N.Y. Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 227–28 (S.D.N.Y. 2007))).

## II.    RELIGIOUS DISCRIMINATION BASED ON FAILURE TO ACCOMMODATE

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee because of his or her religion. *Cosme v. Henderson*, 287 F. 3d 152, 157 (2d Cir. 2002) (citing 42 U.S.C. § 2000e–2(a)(1) (1994)). Pursuant to Section 701(j) of the Act, "when an employee has a genuine religious practice that conflicts with a requirement of employment, his or her employer, once notified, must offer the aggrieved employee a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship." *Cosme*, 287 F. 3d at 158. To establish a religious discrimination claim based on a failure to accommodate, a plaintiff has the initial burden of proving a *prima facie* case of discrimination. *St. Juste v. Metro Plus Health Plan*, 8 F.Supp.3d 287, 315 (E.D.N.Y. 2014); *see also Bowles v. N.Y.C. Transit Auth.*, 285 Fed. App'x 812, 813 (2d Cir. 2008) (summary order) (same). "If the plaintiff has established his prima facie case, the employer then has the burden to show that it made good faith efforts to provide the employee with a reasonable accommodation or that providing such an accommodation would cause undue hardship to the employer's business." *Elmenayer v. ABF Freight Sys.*, 98-CV-4061, 2001 WL 1152815, at *5 (E.D.N.Y. Sept. 20, 2001); *see Baker v. The Home Depot*, 445 F.3d 541, 548 (2d Cir. 2006) (explaining that if a plaintiff establishes a *prima facie* case, "the employer 'must offer [him] a reasonable

accommodation, unless doing so would cause the employer to suffer an undue hardship'") quoting *Cosme*, 287 F.3d at 158)); *see also E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) ("If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship.")

A.     *Prima Facie* **Case**

To establish a *prima facie* case of religious discrimination under Title VII, a plaintiff must prove that (1) he has a bona fide religious belief that conflicts with an employment requirement; (2) he informed the employer of this belief; and (3) he was disciplined for failing to comply with the conflicting employment requirement. *Baker*, 445 F.3d at 546; *see also Bowles*, 285 Fed. App'x at 813 (citing *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985), *aff'd* 479 U.S. 60 (1986)) (same).

As to the first prong of Plaintiff's *prima facie* case, Defendant has not asserted or argued that Plaintiff's Orthodox Jewish faith is not sincere, and it is undisputed that there was a conflict between Plaintiff's commitment to observing the Sabbath and his employment schedule. The Court therefore finds that Plaintiff has established the first prong of his *prima facie* case. *See Reznick v. Aramark Corp.*, 97-CV-18977, 1999 WL 287724, at *11 (E.D.N.Y. May 5, 1999) ("As an Orthodox Jewish person, plaintiff undoubtedly holds a bona fide religious belief that requires her to refrain from working on the Jewish Sabbath or on Jewish holidays.").

It also is undisputed that Plaintiff has established the second prong of his *prima facie* case, as Defendant acknowledges that Plaintiff informed Strada and other supervisors on multiple occasions, including in his April 5, 2013 and April 17, 2013 letters, that he was Jewish and therefore was requesting the Sabbath off. (*E.g.*, Def. 56.1 ¶ 52, 60, 70–71; Def's Ex. Q.)

Defendant argues, however, that Plaintiff has not established the third prong of his *prima facie* case because (1) Plaintiff suffered no adverse employment action in connection with his AWOL Designations; (2) Plaintiff suffered no adverse employment action in connection with not receiving pay on days on which he did not report to work; and (3) Plaintiff was not constructively discharged.

"The Second Circuit has never defined 'discipline' within the context of the three-pronged religious discrimination test." *Lewis v. N.Y. City Transit Auth.*, 12 F. Supp. 3d 418, 443 (E.D.N.Y. 2014) (quoting *Siddiqi v. N.Y. City Health & Hosp. Corp.*, 572 F. Supp. 2d 353, 370 (S.D.N.Y. 2008) (citations omitted)); *Guy v. MTA N.Y. City Transit*, 10-CV-1998, 2012 WL 4472112, at *7 (E.D.N.Y. Aug. 6, 2012), *report and recommendation adopted*, No. 10-CV-1998, 2012 WL 4472098 (E.D.N.Y. Sept. 26, 2012) (same). However, the discipline prong of the failure-to-accommodate *prima facie case* "'has been equated with the requirement of an adverse employment action' under the *McDonnell Douglas* framework." *Lewis*, 12 F. Supp. 3d at 443 (quoting *Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 695 (S.D.N.Y. 2011)); *see, e.g.*, *Marmulszteyn*, 523 Fed. App'x 13, 14 (2d Cir. 2013) (summary order) (holding that plaintiff "failed to establish a *prima facie* case for his failure-to-accommodate claim because no evidence suggests that he suffered an adverse employment action")); *Leifer v. N.Y. State Div. of Parole*, 391 Fed. App'x 32, 34 (2d Cir. 2010) (summary order) (finding that plaintiff's failure to accommodate claim failed because there was "insufficient evidence showing that [he] suffered an adverse employment action"); *Bowles*, 285 Fed. App'x at 813–14 (stating, in discussing the third prong of a Title VII accommodation claim, that plaintiff "had failed to offer any evidence tending to establish that he had suffered any adverse employment action" and citing to Title VII's definition of "adverse employment action").

An adverse employment action includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000); *Edwards v. Elmhurst Hosp. Ctr.*, 11-CV-4693, 2013 WL 839535, at *4 (E.D.N.Y. Feb. 15, 2013) (explaining that the third prong "requires some adverse employment action—typically, discipline, demotion, transfer or termination—for refusing to comply with the conflicting employment requirement") (internal alteration omitted). "To be 'materially adverse,' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Galabya*, 202 F.3d at 640 (internal quotation marks and citation omitted).

Although the Second Circuit has not settled the matter, courts have found that requiring an employee to take *approved* unpaid leave for religious observance can constitute an adverse action for purposes of a failure to accommodate claim. *See St. Juste*, 8 F. Supp. 3d at 318 (assuming without deciding that "Defendants' failure to pay for time off [was] 'discipline' for purposes of Plaintiff's *prima face* case," "[i]n light of the fact that this prong of the analysis in a failure to accommodate claim is viewed in the same manner as the 'adverse employment action' requirement in the discrimination context, and since in the discrimination context courts find that being required to take unpaid leave can be an adverse employment action"); *Guy*, 2012 WL 4472112, at *7 ("assum[ing] without deciding that being forced to take unpaid leave to observe the Sabbath, when that results in a reduced schedule and a loss in pay, could constitute an adverse action sufficient to establish a prima facie case of religious discrimination"); *Thompson*, 2005 WL 643433, at *8 (implying that lost wages qualified as an adverse action by explaining that plaintiff "did not lose any wages or suffer any *other* type of adverse employment action")

(emphasis added); *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 04-CV-0069, 2006 WL 1999133, at *4 (S.D. Ala. July 14, 2006) ("The court finds that the imposition, against plaintiff's will, of a 30-day unpaid leave was a disciplinary action, rather than an accommodation as claimed by defendant"), *aff'd*, 506 F.3d 1317 (11th Cir. 2007).

Furthermore, courts have found unpaid leave to be an adverse employment action in the context of other Title VII and ADA claims. *See Hughes v. City of Rochester*, 12-CV-6112, 2016 WL 4742321, at *6 (W.D.N.Y. Sept. 12, 2016) (stating, in a Title VII disparate impact case, that "at a minimum, the adverse employment actions . . . include: [the employer's] decision to place plaintiff on unpaid leave"); *Horsham v. Fresh Direct*, 136 F. Supp. 3d 253, 264 (E.D.N.Y. 2015) (stating in an ADA case that "[p]lacing an employee on unpaid leave can constitute an adverse employment action") (citing *St. Juste*, 8 F.Supp.3d at 318)); *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 583 (S.D.N.Y. 2008) (stating that "[b]eing placed on unpaid leave and termination of employment constitute adverse employment actions" in the context of an ADA retaliation claim) (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)); *see also Chin-McKenzie v. Continuum Health Partners*, 876 F. Supp. 2d 270, 286 (S.D.N.Y. 2012) (assuming *arguendo* that an unpaid medical leave of absence was a material adverse employment action for purposes of a sexual harassment retaliation claim).

Defendant presents a number of cases in support of the proposition that unpaid leave does not constitute an adverse employment action. (Dkt. 24-1 (Def. Br.), at 8–9.) However, none of these cases are on point. They all hold that at the *second* stage of the Title VII accommodation analysis, after the burden has shifted to the defendant, unpaid leave can be a reasonable accommodation. None of these cases holds that unpaid leave does not constitute an adverse employment action at the *prima facie* stage. *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60,

70 (1986) (remanding for a determination of whether requiring an employee to use unpaid, unauthorized leave to observe a handful of holy days a year was a reasonable accommodation, and opining that "requiring respondent to take unpaid leave for holy day observance that exceeded the amount allowed by the collective-bargaining agreement, would generally be a reasonable one"); *Firestone Fibers & Textiles Co.*, 515 F.3d at 316 (holding, after defendant conceded that plaintiffs had established a *prima facie* case, that the employer's accommodation, which included allowing employees to use 60 hours of unpaid leave to observe religious holidays, was reasonable); *United States v. City of Albuquerque*, 545 F.2d 110, 114 (10th Cir. 1976) (finding that leave without pay could be a reasonable accommodation).[14]

Thus, the Court finds that the situation presented here, which involved Plaintiff having to lose a substantial amount of pay through unpaid leave, constituted an adverse employment action. It is undisputed that Plaintiff suffered unsustainable financial hardship from his situation at MDC Brooklyn, such that he had to resign. Furthermore, the situation here unquestionably had an even greater adverse impact on Plaintiff because, in addition to being required to take six or seven days of *approved* unpaid leave, Plaintiff was denied *any* accommodation for approximately nine days of work, for which he was designated AWOL—all within his first three months on the job. As a result, he was forced to engage in acts of insubordination, enduring the stress of simply not showing up to scheduled shifts and knowing that he would be marked

---

[14] Defendant also cites to *O'Neill v. City of Bridgeport Police Dept.*, 719 F. Supp. 2d 219 (D. Conn. 2010), for the proposition that an employer's failure to eliminate the conflict, while it may indicate a failure to accommodate, does not itself constitute an adverse employment action. *Id.* at 226. This may be true, but it does not lead to the conclusion that a substantial loss in pay, caused by *repeated* instances of unpaid leave, does not constitute an adverse employment action. To the contrary, *O'Neill* itself observed that "if, hypothetically, [the defendant] had responded to [the plaintiff's] request for an accommodation . . . by demoting him to a position that had Saturdays off but *paid significantly less*, such a demotion would undoubtedly have been an adverse employment action. . . ." *Id.* at 227 (emphasis added).

AWOL and could be disciplined.   While the risk of discipline might not, in itself, be sufficient to constitute an adverse action,[15] the Court finds that a substantial and unsustainable financial burden—such as having to forfeit fifteen or sixteen days of paid work within a three-month period, coupled with the real risk of discipline and termination, amounts to an adverse action "more disruptive than a mere . . . alteration of job responsibilities", *Miller v. Praxair, Inc.*, 408 Fed. App'x 408, 410 (2d Cir. 2010) (summary order), and is on par with "a demotion evidenced by a decrease in wage or salary" or "a material loss of benefits."  *Galabya*, 202 F.3d at 640.[16]

---

[15] Most courts in this Circuit have declined to find that a plaintiff has established the third prong of his *prima facie* case solely because he was written up for missing work without further disciplinary action.  *See Weber v. City of N.Y.*, 973 F. Supp. 2d 227, 261–62 (E.D.N.Y. 2013) (finding no *prima facie* case where "[t]he only alleged disciplinary action was a letter to Plaintiff's file," and the plaintiff had "not shown that the alleged note in his file resulted in any adverse action"); *Guy*, 2012 WL 4472112 at *7 (finding no disciplinary action where the plaintiff's supervisor wrote him up for being absent without leave and warned him that "[f]urther discipline[e] may follow" because "the record does not reflect that any disciplinary action was taken against plaintiff"); *Durant v. Nynex*, 101 F. Supp. 2d 227, 233 (S.D.N.Y. 2000) (finding that plaintiff, a Seventh-Day Adventist, had not shown that she was disciplined for failure to work on the Sabbath, even though Defendant "impose[d] 'disciplinary steps' against her . . . for her lateness associated with [her] observance of the Sabbath," and observing that "[n]egative evaluations alone, without any accompanying adverse result . . . are not cognizable" (quoting *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 283 (S.D.N.Y. 1999))); *see also Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) (summary order) (stating that "while negative employment evaluation letters or reprimands may be considered adverse employment actions, here there was no proof that this evaluation had any effect on the terms and conditions of [plaintiff's] employment") (internal alterations and quotations omitted)); *Browne v. City Univ. of N.Y.*, 419 F. Supp. 2d 315, 332 (E.D.N.Y. 2005) ("A negative evaluation alone, absent some accompanying adverse result such as demotion, diminution of wages, or other tangible loss, does not constitute an adverse employment action.").

[16] In light of the Court's finding that Plaintiff has met his burden of showing an adverse employment action, it declines to consider whether Plaintiff has established a constructive discharge claim.

**B.      Reasonable Accommodation**

Once an employee establishes a *prima facie* case, the burden shifts to the employer, who "must offer [the employee] a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship." *Baker*, 445 F.3d at 546 (quoting *Cosme*, 287 F.3d at 158); *Elmenayer*, 2001 WL 1152815, at *5 (explaining that "once a prima facie case is shown, the burden shifts to the employer to demonstrate that a reasonable accommodation was offered or, if it was not, that any accommodation would cause undue hardship to the employer"); *see also Thompson*, 2005 WL 643433, at *7 (stating that "[a]n employer is compelled to accommodate all aspects of an employee's religious observance and practice, as well as beliefs, unless the employer demonstrates that it is unable to offer a reasonable accommodation without undue hardship on the conduct of its business"); *Reznick*, 1999 WL 287724, at *10 ("Under Title VII, an employer may not discriminate against any employee on the basis of the employee's religious beliefs unless the employer can show that a 'reasonable accommodation' of the employee's religious needs would cause 'undue hardship' for the employer's business.") (citing 42 U.S.C. § 2000e(j)).

A reasonable accommodation "is one that 'eliminates the conflict between employment requirements and religious practices.'" *Elmenayer*, 2001 WL 1152815, at *5 (quoting *Ansonia*, 479 U.S. at 70); *see also Baker*, 445 F.3d at 548 (finding offered accommodation not reasonable because it "[did] not eliminate the conflict between the employment requirement and the religious practice."); *Cosme*, 287 F. 3d at 159 (explaining that for an accommodation to be reasonable, it "had to have eliminated the conflict between the employment requirement, working on Saturdays, and the employee's religious practice of not working on the Saturday Sabbath," but concluding that employer's offered accommodations eliminated the conflict). *Cf.*

*Marmulszteyn*, 2013 WL 3021144, at \*14–15 (employer "eliminated [plaintiff's] religious conflict because, when he was assigned a Saturday morning shift, he was allowed to switch to a Saturday shift beginning at 10:00 p.m., after his Sabbath ends."); *City of Albuquerque*, 545 F.2d at 114 (stating, in finding the accommodation reasonable, that "the employer did not stubbornly insist that [the plaintiff] work on his Sabbath, come what may").

The process of finding a reasonable accommodation is "intended to be an interactive process in which both the employer and employee participate." *Elmenayer*, 2001 WL 1152815, at \*5. "While the employer bears the burden of making a reasonable accommodation for the religious beliefs of an employee, the employee, too, must make some effort to cooperate with an employer's attempt at accommodation." *Id.* (internal quotation omitted). "Where an employer has made a good faith effort to accommodate an employee's religious practices, courts in this circuit have not looked further to make a determination as to what precisely constitutes reasonableness." *Id.*, at \*6; *see also Cosme*, 287 F.3d at 158 (stating that an employer "need not offer the accommodation the employee prefers," but is only required to offer "any reasonable accommodation.").

Although Defendant is correct that courts have held that voluntary shift swaps[17] and allowing an employee to use unpaid leave[18] can be reasonable accommodations, Defendant's

---

[17] *See, e.g.*, *Elmenayer*, 2001 WL 1152815, at \*6 (upholding as reasonable employer's accommodation of telling plaintiff to bid for a shift that did not conflict with his Friday prayer obligations rather than implement plaintiff's preferred accommodation of altering his lunch period, noting that the fact that plaintiff "would have to work evenings, or nights, in order to remove the conflict does not render the proposal unreasonable" and that "[b]y refusing to exercise his option to bid on those shifts, it was [plaintiff], not [his employer], who became responsible for the continuing conflict").

[18] *See St. Juste*, 8 F. Supp. at 318 (finding that Muslim plaintiff had received a reasonable accommodation when his employer told him he could take either unpaid leave or vacation days to attend congregational prayer on Fridays, and stating that allowing an employee to use unpaid leave to attend Friday prayers "is a reasonable accommodation"); *Ansonia*, 479 U.S. at 70–71

proposed solution of shift swaps and taking unpaid leave—which left Plaintiff with nine days in three months in which he had to either show up to work or be marked AWOL, despite his efforts to swap shifts—did not "eliminate the conflict between the employment requirement and the religious practice." *Baker*, 445 F.3d at 548. The critical difference in this case is that although Defendant gave Plaintiff the option of shift swaps and authorized unpaid leave, as a practical matter, Plaintiff would never have been able to find enough officers who would voluntarily trade with Plaintiff for his Friday night and Saturday shifts[19], and as a brand new, still probationary, officer, Plaintiff did not have enough seniority to bid on a schedule that would have accommodated his religious observance.[20] It was therefore inevitable that Plaintiff would have to not only take unpaid leave, but would have to be absent and designated AWOL for his assigned Saturday shifts. Indeed, Defendant knew all of this when it refused Plaintiff's request for a permanent accommodation and only offered him the option of swapping shifts and taking

---

(noting that "[t]he provision of unpaid leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work," and observing further that "[g]enerally speaking, [t]he direct effect of [unpaid leave] is merely a loss of income for the period the employee is not at work [and] has no direct effect upon either employment opportunities or job status") (quotation omitted)).

[19] As previously noted, there are four shifts of officers between Friday sundown and Saturday an hour after sundown.

[20] The Court understands that the district court in *Elmenayer*—cited by Defendant for the proposition that an accommodation can be reasonable even when it does not eliminate the conflict—rejected the plaintiff's argument that the employer's proposed accommodation of having plaintiff bid on evenings or nights was unreasonable because he was not guaranteed that he would always be able to bid successfully on those shifts. 2001 WL 1152815, at *7. *Elmenayer* is distinguishable, though, because the record in that case showed that at least for the year following his rejection of the accommodation, plaintiff "had sufficient seniority to bid for and obtain shifts that would not conflict with his religious practice." *Id.* Indeed, the court in *Elmenayer* observed, in *dicta*, that "[i]f [plaintiff] had accepted the accommodation, only to find a year later that his bids for alternative shifts were unsuccessful due to his seniority, [his employer's] obligation to reasonably accommodate plaintiff's religious practice may well have required it to do more for him." *Id.*

leave without pay. (*See* Def. 56.1 ¶ 94 (senior officers "generally" bid to have Friday evenings and Saturdays off); Def. 56.1 ¶ 96 (probationary officers "generally did not have Saturdays off").) In effect, Defendant's proposed solution was almost no accommodation at all.

In assessing the reasonableness of this purported accommodation, the Court is guided by the Second Circuit's decision in *Baker*. There, the plaintiff, an observant Christian, was unable to work on Sundays because of his religious conviction that he was prohibited from working on the Christian Sabbath. *Id.* at 543–45. The district court found that the employer's offer to schedule the plaintiff "to work in the afternoon or evenings on Sundays, thus allowing him an opportunity to attend his religious services, [was] a reasonable accommodation." *Id.* at 547. The Second Circuit reversed, explaining:

> The shift trade offer accommodated only one of [the plaintiff's] concerns, that of missing church service on Sunday, but failed to address [the plaintiff's] principal objection to working on Sunday. An employer does not fulfill its obligation to reasonably accommodate a religious belief when it is confronted with two religious objections and offers an accommodation which completely ignores one. . . It follows that the shift change offered to [the plaintiff] was no accommodation at all because, although it would allow him to attend morning church services, it would not permit him to observe his religious requirement to abstain from work *totally* on Sundays. Simply put, the offered accommodation cannot be considered reasonable because it does not eliminate the conflict between the employment requirement and the religious practice.

*Id.* at 547–48 (internal quotations and alterations omitted).

So too here, the "accommodation" offered by Defendant, which did not, in reality, permit Plaintiff to observe his religious requirement to abstain from work between Friday sundown to Saturday sundown "cannot be considered reasonable because it does not eliminate the conflict between the employment requirement and the religious practice." *Id. See also Ansonia*, 479 U.S. at 70–71 (explaining that unpaid leave generally is a reasonable accommodation because it "eliminates the conflict . . . by allowing the individual to observe *fully* religious holy days")

(emphasis added); *Crider v. Univ. of Tennessee, Knoxville*, 492 Fed. App'x 609, 612–13 (table)

(6th Cir. 2012) (rejecting as unreasonable defendant's proposed accommodation that on

plaintiff's Sabbath, she would only need to monitor the emergency cell phone in an emergency

situation or when the other two employees were out of town, explaining that "[a]lthough an

employee is obligated to cooperate with an employer's attempt at accommodation, cooperation is

not synonymous with compromise, where such compromise would be in violation of the

employees' religious needs," and holding that "[o]ffering [the plaintiff] fewer Saturday shifts is

not a reasonable accommodation to religious beliefs which *prohibit* working on Saturdays").[21]

　　The Court recognizes that *Trans World Airlines, Inc. v. Hardison* ["*Hardison*"], 432 U.S.

63 (1977) and its progeny have greatly eased an employer's burden to accommodate an

employee's religious practice when an employee is subject to a seniority system under a CBA.

Some courts have broadly applied the Supreme Court's decision in *Hardison* to, in effect, grant

employers *carte blanche* to avoid eliminating a religious conflict for employees under such a

---

[21] Defendant cites several cases, including *Elmenayer*, discussed *supra* at n. 20, to support the proposition that an accommodation can be reasonable even when it fails to eliminate the conflict.  As with *Elmenayer*, however, many of these cases are distinguishable from the instant case.  For example, while Defendant is correct that the court in *E.E.O.C. v. Delta Airlines, Inc.*, 97-CV-5646, 2002 WL 1447582 (E.D.N.Y. June 26, 2002) held that "[t]he mere possibility that the accommodation [of voluntary shift swaps] might have failed at some point does not retroactively render Defendant's . . . offer of accommodation unreasonable," *id.* at *6, in that case, the plaintiff "never waited for this moment to come to pass," instead "refus[ing] the accommodation offered by [the defendant] because it could not guarantee that he would be able to observe the Sabbath."  *Id.*  By contrast, here, Plaintiff accepted Defendant's proposed accommodation of shift swaps and unpaid leave, and actively worked with Defendant to try to find coverage or be granted unpaid leave for each conflict; and yet, the accommodation failed *nine* times in three months.  Unlike the plaintiff in *Delta Airlines*, Plaintiff can demonstrate far more than the "mere possibility that the accommodation might have failed."  *Id.* at *6.

To the extent that other courts in this Circuit have found religious accommodations to be reasonable where they fail to eliminate the conflict, as required by *Baker*, the Court declines to follow them.  *See, e.g.*, *McLaughlin v. N.Y. City Bd. of Educ.*, 04-Civ.-1270, 2008 WL 216308 (S.D.N.Y. Jan. 22, 2008); *Siddiqi v. N.Y. City Health & Hosps. Corp.*, 572 F. Supp. 2d 353 (S.D.N.Y. 2008).

system.  *See, e.g.*, *Sides v. NYS Div. of State Police*, No. 03-CV-153, 2005 WL 1523557, at *5 (N.D.N.Y. June 28, 2005) (granting summary judgment to employer that denied plaintiff's request for accommodation without any attempts to work with him, explaining that "[d]efendant is "not required by Title VII to carve out a special exception to its seniority system in order to help [Plaintiff] meet his religious obligations.").

This Court does not read *Hardison* so expansively, and finds that it can be fairly distinguished from the present case.  In *Hardison*, the employer, Trans World Airlines, Inc. ("TWA"), in seeking to accommodate the employee, "agreed to permit the union to seek a change of work assignments for [the plaintiff,] but the union was not willing to violate the seniority provisions set out in the collective-bargaining contract."  432 U.S. at 68.  The Supreme Court stated that in such a case, the duty to accommodate did not require TWA "to take steps inconsistent with the otherwise valid [collective bargaining] agreement," 432 U.S. at 79.  The Court explained that because "the union was unwilling to entertain a variance over the objections of men senior to [the plaintiff]", "for [TWA] to have arranged *unilaterally* for a swap would have amounted to a breach of the collective-bargaining agreement," *id.* at 78–79 (emphasis added), a result that was not required.[22]  *See also id.* at 83, n.14 ("We accept the District Court's findings that TWA *had done all that it could do* to accommodate Hardison's religious beliefs without either incurring substantial costs or violating the seniority rights of other employees.") (emphasis added)).

---

[22] Additionally, in *Hardison*, in addressing the Eighth Circuit's finding below that "the possibility of a variance from the seniority system was never really posed to the union," the Supreme Court, rather than stating that it did not matter whether the union was asked about an accommodation, rejected the Eighth Circuit's finding as "contrary to the District Court's findings and to the record."  *Hardison*, 432 U.S. at 78.  While the Court recognizes that this does not equate to a clear holding that the Court would have ruled otherwise without evidence that the union was consulted, it does find that it lends support to the Court's interpretation of the *Hardison* holding.

The Second Circuit has stated that *Hardison* stands for the proposition that "employers are not required to *breach* an agreed-upon seniority system to accommodate the religious needs of employees." *Cosme,* 287 F.3d at 161 (emphasis added). This is consistent with the *Hardison* Court's holding that the employer was not required to "unilaterally", *i.e.*, without the union's assistance or approval, swap the plaintiff's schedule with someone senior to him, 432 U.S. at 78–79, and is also consistent with this Court's interpretation of *Hardison*. Neither *Cosme* nor *Hardison* holds that an employer will be deemed to have reasonably accommodated an employee who is affected by a CBA when the employer denies the employee an accommodation without even contacting the union.[23] *See E.E.O.C. v. Chemsico, Inc.*, 216 F. Supp. 2d 940, 953–54 (E.D. Mo. 2002) (finding defendants "failed to meet their burden of demonstrating that as a matter of law, they would have suffered more than a de minimus hardship had they further accommodated [the plaintiff]," when the employer had not contacted a union representative to try to alter the Collective Bargaining Agreement to accommodate her, and the employer had made no attempts to replace plaintiff despite knowing she did not intend to work on a Saturday); *Jenoe Rottenberg v. Frank, Postmaster Gen., U.S. Postal Serv.*, EEOC DOC 01891132, 1990 WL 711682, at *3 (Jan. 10, 1990) ("The situation in *Hardison* . . . is clearly distinguishable from the one we have here in that . . . unlike TWA, the agency did not contact the union to determine whether a mutually agreeable accommodation could be reached.").

---

[23] *Hardison* may be distinguishable in another way as well. Marin-Rodriguez testified that the CBA in this case, the Master Agreement, covered only non-probationary employees, and that probationary employees—like Plaintiff—were not governed by the Agreement. (Def. Ex. L, at 17.) Given the reasoning behind *Hardison*, it is far from clear that *Hardison* applies to a case like this, where the employee who was denied the accommodation, is not even subject to the CBA. *See Hardison*, 432 U.S. at 78 (reasoning that "the [seniority] system itself represented a significant accommodation to the needs, both religious and secular, of *all* of [defendant's] employees") (emphasis added).

Many of the cases in which courts have cited *Hardison* to find an unsuccessful accommodation reasonable have involved situations where an employer tried to work out a solution with the union before concluding that none was possible. *See, e.g., Cook v. Chrysler Corp.*, 981 F.2d 336, 338–39 (8th Cir. 1992) (applying *Hardison* to uphold an employer's attempts at accommodating plaintiff as reasonable when the defendant "approached the Union and tried to find a way to accommodate [the plaintiff,] but "[t]he Union was not willing to grant [plaintiff] a change of shift out of line with seniority."); *Elmenayer*, 2001 WL 1152815, at *3 (noting that at supervisor's request, plaintiff, Union shop steward and supervisor met to discuss how defendant could accommodate plaintiff's religious obligations); *Kalsi v. N.Y. City Transit Auth.*, 62 F. Supp. 2d 745, 758–59 (E.D.N.Y. 1998) (finding that the employer was not required to violate the seniority system *after* it reached out to the vice president of the union to ask whether plaintiff could be placed in a different role, and the vice president had refused), *aff'd*, 189 F.3d 461 (2d Cir. 1999); *Fisher v. Material Servs. Corp.*, 84-C-932, 1985 WL 1651, at *1 (N.D. Ill. May 30, 1985) (noting that "[t]he union refused to waive the seniority provision"). *But see, e.g., Sides*, 2005 WL 1523557 (holding that employer was not required to carve out exception to the seniority system even though it does not appear that employer reached out to the union). Here, Defendant has not submitted any evidence that Strada, Marin-Rodriguez, Hess, or anyone else from MDC Brooklyn or the BOP, attempted to work out an accommodation for Plaintiff with the Union.[24]

The Court is particularly disinclined to extend the holding of *Hardison* to this case, given the troubling policy implications of a broad application of that decision. As Justice Thurgood

---

[24] While this might be explained by the fact that, as a probationary employee, Plaintiff was not covered by the Master Agreement (Def's Ex. L, at 17), the Court finds that the lack of CBA coverage does not make Defendant's proposed accommodation reasonable; rather, it simply makes *Hardison* distinguishable. *See supra* at n. 23.

Marshall noted in his dissent in *Hardison*, "a society that truly values religious pluralism cannot compel adherents of minority religions to make the cruel choice of surrendering their religion or their job." *Hardison*, 432 U.S. at 87 (Marshall, *J.*, dissenting). A CBA by its nature is designed to protect the rights of the majority, and "adherents to minority faiths who do not observe the holy days on which most businesses are closed . . . but who need time off for their own days of religious observance" thus require statutory protection. *Id.* at 85, 88–89. A primary purpose of the 1972 Amendments to Title VII was to provide such statutory protection; therefore, the overextension of *Hardison* could undermine that congressional objective.[25] The Court therefore declines to "erode" even further "one of this Nation's pillars of strength[,] our hospitality to religious diversity", *id.* at 97, by extending *Hardison*'s holding, that an employer does not need to flout the expressly unyielding wishes of the union, to a situation where the employer does not even contact the Union.[26]

---

[25] As Justice Marshall observed, the 1972 Amendments to Title VII, which amended the definition of religion to explicitly require employers to accommodate an employee's religious practices, were introduced in response to cases such as *Dewey v. Reynolds Metals Co.*, 429 F.2d 324 (6th Cir. 1970), *aff'd by equally divided Court*, 402 U.S. 689 (1971). *Hardison*, 432 U.S. at 88–89 (Marshall, *J.*, dissenting). In *Dewey*, the Supreme Court had reasoned that excusing religious observers from neutral work rules would 'discriminate against . . . other employees' and 'constitute unequal administration of the [CBA].'" *Id.* at 89. The primary purpose of the 1972 Amendment, as explained by its author, Senator Jennings Randolph, was to protect Saturday Sabbatarians, like himself, from employers who refused "to hire or to continue in employment employees whose religious practices rigidly require them to abstain from work in the nature of hire on particular days." *Id.* (quoting 118 Cong.Rec. 705 (1972)). Justice Marshall opined that the majority's decision in *Hardison* "follow[ed] the Dewey decision in direct contravention of congressional intent." *Id.*

[26] The Court additionally notes that the principle expressed in *Cosme,* that "the neutral operation of a *bona fide* seniority system, even if it has 'some discriminatory consequences,' does not violate the proscription against religious discrimination in employment", has no application here. *Cosme*, 287 F.3d at 160 (quoting *Hardison*, 432 U.S. at 82). Plaintiff is not arguing that the seniority system in the Master Agreement itself was discriminatory—as asserted in *Cosme* (*id.*)—but rather, is merely arguing that Defendant could have offered him a reasonable accommodation notwithstanding the provisions of the Master Agreement. *See Leonce v. Callahan*, 7:03-CV-110, 2008 WL 58892, at *4 (N.D. Tex. Jan. 3, 2008) ("[T]he mere existence

Accordingly, the Court finds that Defendant has failed to show, as a matter of law, that the religious accommodation it offered to Plaintiff was reasonable.[27]

## C.      Undue Hardship

If an employer's proposed accommodation is not reasonable, the burden remains on the employer to show that it is unable to offer a reasonable accommodation without undue hardship. *See Elmenayer*, 2001 WL 1152815, at *5 (explaining that "once a prima facie case is shown, the burden shifts to the employer to demonstrate that a reasonable accommodation was offered or, if it was not, that any accommodation would cause undue hardship to the employer"); *see also Thompson*, 2005 WL 643433, at *7 (stating that "[a]n employer is compelled to accommodate all aspects of an employee's religious observance and practice, as well as beliefs, unless the employer demonstrates that it is unable to offer a reasonable accommodation without undue hardship on the conduct of its business"); *Ansonia*, 479 U.S. at 68–69 ("[T]he extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship.").

An accommodation "causes 'undue hardship' whenever [it] results in "more than a *de minimis* cost' to the employer." *Ansonia*, 479 U.S. at 67 (quoting *Hardison*, 432 U.S. at 84). "[W]hether an employer can reasonably accommodate a person's religious beliefs without undue

_____

of an established seniority system that may be impacted by an employee's religious practice imperatives does not *trump* the employer's obligation to accord the employee a reasonable accommodation under Title VII circumstances."). Furthermore, *Hardison* and *Cosme* were decided after bench trials, where "the record[s] w[ere] fully developed below, not on summary judgment." *Antoine v. First Student, Inc.*, 713 F.3d 824, 839 (5th Cir. 2013). "Here, we have only [the employer's] assertions about the constraints of the CBA." *Id.*

[27] The Court does not find that *U.S. Airways v. Barnett*, 535 U.S. 391 (2002) precludes this result. Although *Barnett* discussed *Hardison* in broad terms, it did so in *dicta*, as the case involved the ADA. In *Barnett*, the Supreme Court was not squarely presented with what is required under Title VII's religious accommodation provisions of an employer facing a request for an accommodation in the context of a union-negotiated seniority system.

hardship is basically a question of fact." *Minkus v. Metro. Sanitary Dist. Of Greater Chicago*, 600 F.2d 80, 81 (7th Cir. 1979) (quotation omitted).

Because Plaintiff has established a *prima facie* case, and because the Court holds that the offered accommodation was not reasonable, the burden is on Defendant to demonstrate that "any accommodation would cause undue hardship to the employer." *Elmenayer*, 2001 WL 1152815, at *5. "Because [Defendant] will have this burden at trial, to obtain summary judgment, it must establish beyond peradventure all of the essential elements of the . . . defense." *Ford v. City of Dallas, Tex.*, 3:05-CV-1676, 2007 WL 2051016, at *1 (N.D. Tex. July 12, 2007) (quotation omitted). "This means that it must demonstrate, without genuine and material factual dispute, and as a matter of law, that it was unable to reasonably accommodate [the plaintiff's] religious beliefs without incurring undue hardship." *Id.* at 2 (holding that the defendant had not "carried its burden of showing that all conceivable accommodations would have imposed a more than *de minimis* cost").

Although the Second Circuit does not appear to have directly addressed the issue, many courts have rejected speculative undue hardship. *See Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1033, n.4 (8th Cir. 2008) (explaining that "an employer must establish that the hardship is 'real rather than speculative . . . merely conceivable, or hypothetical," and that "[u]ndue hardship 'cannot be proved by assumptions nor by opinions based on hypothetical facts'" (quoting *Brown v. Polk Cnty.*, 61 F.3d 650, 655 (8th Cir. 1995) (*en banc*), *cert. denied*, 516 U.S. 1158 (1996)); *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1492 (11th Cir. 1989) (rejecting defendant's argument that it would incur increased risk of tort liability if it hired a driver who used peyote in religious ceremonies as too speculative), *cert. denied*, 495 U.S. 948 (1990); *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403, 406–07 (9th Cir. 1978) (rejecting

defendant's argument that accommodating plaintiff's religious practice would cause "serious dissension among employees," and finding that reliance on "unofficial and unscientific polls [showing that] employee dissatisfaction with persons who were free riders or who received differential treatment of any kind" did not undercut finding that claimed hardship was hypothetical); *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir. 1978) (explaining that undue hardship cannot be proved by assumptions or hypotheticals, and that "[e]ven proof that employees would grumble about a particular accommodation is not enough to establish undue hardship."); *see also Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975) ("We are somewhat skeptical of hypothetical hardships that an employer thinks might be caused by an accommodation that never has been put into practice. The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted."); *E.E.O.C. v. Jetstream Ground Servs., Inc.*, 134 F. Supp. 3d 1298, 1334–35 (D. Colo. 2015) ("Any proffered hardship . . . must be actual; '[a]n employer . . . cannot rely merely on speculation.'" (quoting *Toledo*, 892 F.2d at 1492)); *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 966 F. Supp. 2d 949, 962 (N.D. Ca. 2013) (explaining that in the Ninth Circuit, "[h]ypothetical or merely conceivable hardships cannot support a claim of undue hardship").

Here, Defendant bases its claim of undue hardship on the negative impact that the requested accommodation would have on officer morale, the seniority system, safety, and the budget at MDC Brooklyn. In support of its claim of hardship, Defendant relies mainly on Strada's testimony. However, while Strada is certainly qualified to testify about these subjects, his testimony in this matter is largely conclusory and unsupported. As discussed further below,

the Court does not find that Defendant has adequately proved its claim that undue hardship would result from Plaintiff's requested religious accommodation.

1.   Officer Morale

First, Defendant has offered little evidence to support its assertion that granting Plaintiff a permanent accommodation would affect employee morale.   Strada testified that "if staff keep getting pulled from their original duties to relieve others . . . a post they didn't sign for or bid for, it's common that they wouldn't be too happy about it." (Def's Ex. H at 43.) However, when asked how desirable Sunday shifts were for correctional officers, he stated: "I don't know. . . . I did not control the roster. . . . I didn't have anything to do with the roster assignments, days off."  (*Id.* at 45); *see also* Def's Ex. J, p. 3 ¶ 14 (stating without elaboration that a factor he considered was officer "morale" and that "[Plaintiff's] absence may create an increased workload for his co-workers.")

Defendant also points to Plaintiff's statements that "everybody seem[ed] to know" about the situation and that "some officers were great, some Lieutenants were great, but others were just like --- they made me feel like, 'Oh, you're the guy that's having a problem'" and "'You're the one that wants to be a senior on the fast track and take the weekends off.'" (Def's Ex. D., at 29.)  This statement, while it does indicate that at least a few officers have expressed some resentment, does not prove, as a matter of law, that actually accommodating Plaintiff would have affected officer morale to such a degree as to constitute an undue hardship or burden to Defendant.   Neither does Strada's wholly conclusory and unsupported statement that "it's common that [staff] wouldn't be too happy about [being reassigned]." (Def's Ex. H at 43.) Defendant offers no evidence that the accommodation of a single officer's religious beliefs actually would have impacted the morale of MDC Brooklyn's 320-officer work force in even a

*de minimus* way.  Based on this scant and unsubstantiated evidence, a jury could easily find that Defendant has failed to meet its burden of proving undue hardship on this basis.  *See Brown v. Polk Cnty.*, 61 F.3d 650, 655 (8th Cir. 1995) (*en banc*) ("Undue hardship requires more than proof of some fellow-worker's grumbling . . . .An employer . . . would have to show . . . actual imposition on co-workers or disruption of the work routine.") (quoting *Burns*, 589 F.2d at 407), *cert. denied*, 516 U.S. 1158 (1996).[28]

   2. Seniority System

  Although Hess and Marin-Rodriquez testified that accommodating Plaintiff's religious observance would have violated the seniority structure of the Master Agreement, as discussed above, there is simply no evidence that Defendant tried to work with the Union to reach an accommodation for Plaintiff.  Nor is there evidence demonstrating that it would have been unduly burdensome or impossible to devise an accommodation that would have been consistent with the Master Agreement.  Indeed, given that Plaintiff apparently was only the second person in seven years at MDC Brooklyn who had requested a religious accommodation (Def. Ex. L, at 6-7, 49), it seems likely that had Defendant sought to work with the Union regarding Plaintiff's request, there would have been various ways of accommodating his Sabbath observance without unduly burdening the facility or violating the terms or spirit of the Master Agreement.  For example, Plaintiff's Saturday shifts could have been swapped with the Sunday shifts of other officers.  The record before the Court gives no indication that any such options were considered by Defendant or discussed with the Union.

---

[28] Furthermore, the Court finds *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141 (5th Cir. 1982), cited by Defendant, to be distinguishable on the ground that Defendant experimented with directing other employees to trade shifts with the plaintiff which resulted in demonstrated lowering of morale.  *Id.* at 146–47.  As noted in *Draper*, "[t]he employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted."  *Draper*, 527 F.2d at 520.

Thus, a jury could find that accommodating Plaintiff would not have required a breach of the Master Agreement or even a *de minimis* disruption of the seniority system.

### 3. Budgetary Constraints

The Court similarly finds that Defendant's evidence about the budgetary burden that would result from accommodating Plaintiff is insufficient to warrant summary judgment. Strada testified that MDC Brooklyn operated under a strict budget, a statement that was corroborated by Wolfe and Bradley. (Def. 56.1 ¶¶ 85, 88); (Def's Ex. P (Bradley Deposition), at 6–7); (Def's Ex. O (Wolfe Deposition), at 9.) He also testified that for the days that he denied Plaintiff leave without pay, it was "due to shortage of staff on the custodial roster, no overtime funds available to accommodate his request, and the fact [Plaintiff] was informed he had the opportunity to request a swap of his work schedule with other correctional officers." (Def's Ex. J, ¶ 12.) Notably, Defendant provides no documentary support for Strada's statements about the staff shortage or unavailability of overtime funds.

Strada's testimony is simply insufficient to meet Defendant's burden of demonstrating, as a matter of law, that accommodating Plaintiff would have required Defendant to incur overtime expenses or suffer a financial burden or harm. Construing the evidence in the light most favorable to Plaintiff, it does not appear Strada had any basis for claiming that the requested accommodation would have had any impact on MDC Brooklyn's budget or on other employees. Strada testified that he had received at most one previous request for a religious accommodation before Plaintiff's (Def's Ex. H, at 21–22), and from the record it does not appear that he could have been aware of the impact of any previous attempts to accommodate employees' religious observances. Indeed, Marin-Rodriguez testified that, in her seven years at MDC Brooklyn, she had encountered only one other religious accommodation request. Thus, given the statements of

Defendant's own witnesses, there seems to be no basis for the claim that accommodating Plaintiff's Sabbath observance would have caused the facility any financial burden, no less an undue one.[29]

To the extent Defendant relies on the fact that the facility had to pay 56 hours of overtime in order to cover shifts that Plaintiff was scheduled for, but failed to work, this fact, even assuming it to be true, does not demonstrate that accommodating Plaintiff would have caused a financial burden or budgetary harm to Defendant. Simply put, the fact that Defendant had to pay overtime when Plaintiff failed to appear for his Saturday shifts does not show that the facility would have to pay overtime had it accommodated Plaintiff's request not to work those shifts. Having to find coverage for a shift at the last minute because the scheduled employee has not shown up is a very different situation than planning a schedule in advance that excuses one employee from working a particular shift or shifts. As previously discussed, Defendant has failed to put forth evidence demonstrating that it could not have devised a schedule that would have allowed Plaintiff to observe the Sabbath without requiring overtime coverage by other officers.

Thus, a jury could find that Defendant did not deny Plaintiff a religious accommodation for budgetary reasons. And it could certainly find that accommodating Plaintiff would not have caused Defendant undue financial burden or harm.

    4.    Safety Concerns

Defendant also cites to safety concerns as a basis for not granting Plaintiff his requested accommodation, arguing that "[a]ccommodating Plaintiff's request could require pulling staff

---

[29] Any inference of a financial burden on Defendant is further undercut by the fact that any accommodation of Plaintiff could have been limited in time to extend only to Plaintiff's probationary period, which could have been as short as six months. During that initial period, Plaintiff had no ability to bid on different shift assignments.

from other areas of MDC," and that "an inadequate prison staff would jeopardize the safety of the inmates and the staff, including correctional officers." (Def. Br. at 20.) This argument, like the others, is both speculative and unsupported by the evidence. Defendant has put forth no evidence to show that accommodating the Sabbath observance of one out of 320 correctional officers would have jeopardized anyone's safety at MDC Brooklyn.

As with the overtime issue, Defendant seeks to support its argument with the fact that "when Plaintiff was scheduled to work and did not appear for his shift, MDC Brooklyn pulled other staff members from their posts and paid 56 hours of overtime." *Id.* However, for the same reasons discussed above, this fact provides *no* basis for predicting the consequences of a *planned* accommodation or shift change, and certainly does not demonstrate that security at the facility would have been compromised in any way if the schedule were altered *in advance* to assign another officer to cover the Saturday shifts originally assigned to Plaintiff.[30]

\*        \*        \*

In sum, the evidence proffered at this stage by Defendant regarding all of the above burdens, *i.e.*, Strada's unsupported testimony, while it could provide a sufficient basis for a jury to find that accommodating Plaintiff would impose an undue burden on Defendant, is plainly insufficient to support such a finding as a matter of law. By pointing to several statements from Strada's testimony that are unsupported and conclusory, Plaintiff has "designate[d] specific facts showing that there *is* a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 323–24 (emphasis

_____

[30] If anything, scrambling to find last-minute coverage for the Saturday shifts for which Plaintiff failed to appear presented a greater risk to the facility's security than if a schedule providing for this coverage had been planned in advance, pursuant to an accommodation. Furthermore, though not explained in the record, depending on when the officers received their schedules, it might not have been necessary to make a "change" to the Saturday shift schedule, as opposed to generating a schedule in the first instance that simply did not include Plaintiff on the Saturday roster—which might have lessened or eliminated the impact of the accommodation on officer morale.

added; quotations omitted). At trial, a jury reasonably could conclude, based on Strada's stated, but unsupported, reasons for denying Plaintiff's requested accommodation, that Defendant did not give any real consideration to Plaintiff's request—instead merely offering *post hoc* justifications for not accommodating Plaintiff—and/or that Defendant's reasons for denying the accommodation, even if accepted, are insufficient to justify that denial.[31]

Defendant argues that Plaintiff "has failed to dispute any of the remaining statements properly," because he "has offered no evidentiary basis for his claimed dispute of these facts," merely calling Strada's sworn statements conclusory. (Def. Reply Br. at 2.) Yet the fact that Plaintiff has not offered contrary evidence on an issue as to which Defendant carries the burden does not mean that the Court must simply accept Defendant's 56.1 statements of fact. "[T]he Second Circuit has cautioned . . . [that] a movant may not be granted summary judgment simply because its motion is not properly opposed." *McLaughlin v. N.Y.C. Bd. of Educ.*, 04-Civ.-1270, 2008 WL 216308, at *1 (S.D.N.Y. Jan. 22, 2008) (citing *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)). "Thus, the 'Court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement; it also must be satisfied that the moving party's assertions are supported by the record.'" *Id.* (quoting *Allen v. City of*

---

[31] The Court does not find that the fact that Marin-Rodriguez sent her draft rejection memorandum to the Employment Law Branch, which thereafter approved it, shows that Defendant in fact considered the burden that accommodating Plaintiff would impose on Defendant. Marin-Rodriguez sent only the draft memorandum, which contained nothing about why accommodating Plaintiff would impose a burden on Defendant. While Marin-Rodriguez might have attached Plaintiff's request letter to her draft memorandum, she did not send any documentation regarding the potential impact of Plaintiff's request on the facility, and the Employment Law Branch did not request any. Thus, there is no evidence that the Employment Law Branch considered, or could have considered, the financial, logistical, and security burdens Defendant now claims motivated or justified its denial of Plaintiff's requested accommodation. There is certainly no documentation of the Employment Law Branch's consideration of these issues, which would appear to be outside their purview and expertise.

*N.Y.*, 480 F. Supp. 2d 689, 703 (S.D.N.Y. 2007)). This, the Court finds, Defendant has failed to do.

Accordingly, because Defendant has failed to meet its burden of proving that no accommodation to Plaintiff's religious observance could have been made without Defendant incurring undue hardship, the Court finds that a there remains a disputed issue of fact on this issue and that Defendant, therefore, is not entitled to summary judgment.

## CONCLUSION

Defendant's motion for summary judgment is DENIED. The case will proceed on the question of whether accommodating Plaintiff's religious observance would have imposed an undue burden upon Defendant.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 6, 2017
      Brooklyn, New York